UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JAMES HANDY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 20-cv-2280 |
| | ) |
| ILLINOIS DEPARTMENT OF | ) |
| CORRECTIONS, and others, | ) |
| | ) |
| Defendants. | ) |

### SUMMARY JUDGMENT ORDER

Plaintiff sued under 42 U.S.C. § 1983 alleging an Eighth Amendment claim for deliberate indifference to a serious medical need. Specifically, Plaintiff pursues a claim against Wexford Health Sources, Inc., based on the care he received for Hepatitis C. The matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 52). Plaintiff has filed a Response (Doc. 57) and Defendant a Reply (Doc. 60). The summary judgment motion is granted.

### SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To be a "genuine" issue, there must be more than

"some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**FACTS**

The following facts are from the Motion for Summary Judgment, Response, Reply, and attached exhibits. Where a party has failed to comply with the Local Rules – for example by presenting as one "fact" a compound paragraph with multiple facts, or where the cited portion of the record does not support the asserted fact – the Court proceeds without consideration of the assertions. "A lawsuit is not a game of hunt the peanut, and … neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1993); *see also Rabin v. Flynn*, 725 F.3d 628, 635 (7th Cir. 2013).

<u>The Parties</u>

Plaintiff entered the Illinois Department of Corrections on December 19, 2013, at Graham Correctional Center. He was also variously held at Jacksonville Correctional Center and Vienna Correctional Center.

Defendant Wexford Health Sources, Inc., is a corporation that contracts with IDOC to provide certain healthcare services to inmates.

<u>Plaintiff's Claim</u>

Plaintiff claims Wexford Health Sources, Inc., as an entity, acted with deliberate indifference to his serious Hepatitis C medical needs in violation of the Eighth Amendment.

<u>IDOC Hepatitis C Guidelines and Collaboration with UIC</u>

IDOC Office of Health Services puts out guidelines for treatment of Hepatitis C. (Ex. A[1] at 10-11). IDOC put out an updated Hepatitis C Guideline in August 2012, March 2014, and March 2015. The 2012, 2014, and 2015 IDOC Hepatitis C Guidelines reference IDOC's interagency agreement with the University of Illinois Chicago to direct treatment of IDOC inmates with Hepatitis C. The 2012, 2014, and 2015 guidelines state:

> [T]his collaborative approach serves to provide the HCV population with the standard-of-care for treatment of Hepatitis C in a correctional setting. It relieves the IDOC facility physician from the complex decision making of both therapy and of treatment of secondary side effects, while at the same time offering valuable education in the care of the Hepatitis C population.

(Exs. B, D, and E at 1).

Under the IDOC Hepatitis C Guideline, primary care (Wexford) physicians at IDOC sites are responsible for appropriate screening, initial workups to determine eligibility for treatment, collaborating with the Hepatitis C physician and pharmacist specialists at UIC, and follow up post-treatment.

---

[1] References to Exhibits refer to the attachments to Defendant's Motion (Doc. 52).

After a patient is presented to UIC following the workup by the Wexford physician at an IDOC site, UIC sees the patient over telemedicine. The UIC specialists will determine the specific regimen for patients found ready for HCV treatment. UIC infectious disease physicians write any prescriptions for an IDOC inmate receiving Hepatitis C treatment.

The March 2014 Hepatitis C Guideline states that having less than 12 months from arrival at their "parent facility" until release from IDOC is an absolute exclusion for Hepatitis C treatment.

For care and treatment of Hepatitis C in Illinois, Wexford has no policy separate from the IDOC Hepatitis C Guideline. Wexford doctors treating patients in Illinois must follow IDOC's Hepatitis C Guideline.

The parties disagree as to whether Wexford has or had any of its own "procedures or practices" for care and treatment of Hepatitis C, and whether there was a "unified interpretation and/or application of" the IDOC guideline by Wexford staff. Specifically, Plaintiff points out: Dr. Paul testified that the IDOC Hepatitis C Guidelines changed over the years, and that when the policy changed, she would receive the change within days. (Ex. A at 12). Dr. Kayira testified that even though Graham was a "receiving and classification" institution rather than a "parent institution," he intended to start Plaintiff's treatment while Plaintiff was still at Graham, after 60 days. (Ex. F at 53). Dr. Kayira testified that he was informed by Wexford as to how to treat those who had Hepatitis C, and whether they qualified for treatment according to the IDOC Guidelines. Dr. Paul testified that the date of release requirement in the IDOC Guideline

did not make a difference to Wexford, i.e., they could start treatment notwithstanding that requirement. (Ex. A at 43). Dr. Goodman testified that the 12-month requirement was rigid, because Plaintiff was not going to be in IDOC custody for at least 12 months he was not a candidate for treatment, and that any requested exception would have been denied because health wise Plaintiff was in good shape. (Ex. C at 36-38, 52-53, 62). Finally on this issue Plaintiff points out that according to the guidelines, there was to be a monthly report of patients who were found to be ineligible for Hepatitis C treatment or who were having significant delays in their workup that could impact their ability to receive treatment while incarcerated, but Dr. Goodman never authored such a report and does not know who did. (Ex. C at 69-70).

Dr. Paul testified that UIC physicians make the determination of whether to treat an individual for Hepatitis C. (Ex. A at 83:21-23). In Plaintiff's case, even though doctors believed Plaintiff was ineligible due to his length of stay in IDOC, Dr. Paul, a Wexford doctor, requested in March 2015 that the UIC doctor, Dr. Chan, make an exception to allow Plaintiff to receive Hepatitis C treatment. (Ex. A at 88).

Plaintiff's History with Hepatitis Treatment in IDOC

Plaintiff entered IDOC at Graham on December 19, 2013. Persons in custody typically spend 30 to 60 days or more in receiving and classification at Graham, as temporary residents, before transfer to their parent institution. Plaintiff was at Graham for about four months and was in receiving the entire time. (Ex. H at 63). Dr. Kayira testified that after 60 days, if not transferred, he could begin the Hepatitis C workup on

an inmate. (Ex. F at 18). Dr. Kayira was at relevant times a Wexford employee and was the medical director at Graham from about 2000 through 2020.

When Plaintiff entered Graham, IDOC's August 2012 Hepatitis C Guideline was in effect.

Dr. Kayira physically saw Plaintiff for the first time on January 16, 2014, and at that time he knew or could have know if he had looked at Plaintiff's medical history that Plaintiff had Hepatitis C. His intake paperwork indicates a medical history that includes a diagnosis of Hepatitis C in 1997. He was apparently never treated for the condition while in the community prior to his stint in prison, and instead his doctors were monitoring the disease. On January 17, 2014, Plaintiff saw a prison physician assistant for an intake physical examination. The physician assistant noted Plaintiff should "follow up at final destination for Hepatitis C." Dr. Kayira also saw Plaintiff on February 13, 2014.

On March 28, 2014, Dr. Kayira noted Plaintiff's elevated liver enzymes and requested Plaintiff be placed on the Hepatitis C clinic sick call line. On April 4, Dr. Kayira saw Plaintiff for his elevated liver enzymes. This was the last time Dr. Kayira saw Plaintiff. When Dr. Kayira saw Plaintiff on April 4, Plaintiff did not yet know his release date, so Dr. Kayira noted the release date as "unknown." Dr. Kayira could have accessed Plaintiff's records that indicated his expected release date was November 27, 2015.

On April 16, 2014, Plaintiff transferred from Graham to Jacksonville. Dr. Goodman was the medical director at Jacksonville when Plaintiff was incarcerated

there. Dr. Goodman saw Plaintiff about Hepatitis C on April 28, 2014. When Dr. Goodman began treating Plaintiff in April 2014, the March 2014 IDOC Hepatitis C Guideline was applicable.

When Dr. Goodman saw Plaintiff on April 28, 2014, he believed Plaintiff's release date from IDOC was March 2015. The March 2014 Hepatitis C Guideline states that having less than 12 months from arrival at parent facility is an absolute exclusion for Hepatitis C treatment. Dr. Goodman considered Jacksonville to be Plaintiff's parent facility within the meaning of the March 2014 Hepatitis C Guideline. Based on his belief as of April 2014 that Plaintiff's release date was March 2015, Dr. Goodman believed Plaintiff was not a candidate for treatment under the IDOC March 2014 Hepatitis C Guideline. Dr. Goodman understood that he could request an exception and also believed that a request for an exception would have been denied because Plaintiff was in "pretty good shape medically" and the available treatment was "lousy," that is, at that time, the side effects of Hepatitis C treatment were very burdensome. (Ex. C at 40, 44, 64-66).

On May 12, 2014, Dr. Goodman saw Plaintiff for Hepatitis C clinic. Hepatitis C clinic is a mandatory periodic checkup for all IDOC patients with Hepatitis C.  As of that day Dr. Goodman believed Plaintiff's release date from IDOC was March 2015, still making his length of incarceration insufficient for treatment consideration under the current IDOC Hepatitis C Guideline.

As of July 2015, Dr. Goodman understood Plaintiff's release date to be November 2015, making his length of stay *sufficient* to be considered for Hepatitis C treatment

Page **7** of **17**

under the IDOC Guideline. (Ex. C at 85-86). On August 5, 2014, Dr. Goodman saw Plaintiff for Hepatitis C clinic.

Dr. Dina Paul is a chronic disease and case management director for Wexford. Her duties pursuant to that role were to facilitate compliance with the IDOC Hepatitis C Guideline by helping the IDOC sites gather the information required by the guideline to present a patient to UIC with all the necessary clinical information. She is physically located in Pennsylvania and helps Wexford's on-site physicians understand Hepatitis C. She would conduct remote Hepatis C clinics, though she did not do such clinics at either Jacksonville or Vienna. She testified that the IDOC Guidelines could be very confusing for anybody.

Dr. Goodman testified that he informed Dr. Paul about Plaintiff in August 2014, based on the fact that on September 3, 2014, Dr. Paul emailed recommended Hepatitis C workup labs for Plaintiff. Dr Paul recommended those labs following her review of Plaintiff's December 2012 surgical pathology report.

In September 2014 Plaintiff was considered for Hepatitis C treatment. Plaintiff told Dr. Goodman that he wanted the treatment.

On September 12, Dr. Goodman charted a communication with Dr. Paul about Plaintiff being a candidate for Hepatitis C treatment and Dr. Paul recommended the following labs: repeat CBC, CMP, TSH, Hepatitis C antibody, Hepatitis B surface antigen, Hepatitis B surface antibody, and Hepatitis A antibody.

On September 19, Dr. Goodman saw Plaintiff to discuss the labs recommended by Dr. Paul and ordered those same labs. He later received and reviewed the results of those labs.

In December 2014 Plaintiff had less than 12 months left in IDOC custody, but Dr. Goodman recommended to Dr. Paul that Plaintiff still be considered for Hepatitis C treatment. (Ex. C at 109-110).

On January 5, 2015, Dr. Paul noted she had reviewed Plaintiff's records and made recommendations for the next steps in Plaintiff's Hepatitis C workup. On January 6, Dr. Paul and Dr. Goodman discussed Plaintiff's care, and Dr. Paul recommended labs for Hepatitis C genotype, Hepatitis C quantitative viral load, and RNA by PCR with Plaintiff to return in two to three weeks to review the results. Dr. Goodman ordered those tests and received the results on January 16.

On February 5, after reviewing the lab results on January 16, Dr. Paul recommended additional liver tests of FibroSure blood test and labs for ANA (antinuclear antibody), AFP (alpha-fetoprotein), and ferratin. On February 6, Dr. Goodman ordered those labs. The results of those labs indicated Plaintiff should be referred to UIC for further evaluation for HCV treatment.

On February 25, 2015, Plaintiff transferred from Jacksonville to Vienna. The transfer process ensured Plaintiff's medical care was not interrupted.

As of March 4, 2015, Plaintiff's Hepatitis C workup was covered by the March 2015 IDOC Hepatitis C Guideline. The March 2015 Guideline stated "if Fibrosis Stage result = 4, then refer to UIC Telemedicine Liver Clinic to be assessed and considered for

HCV treatment. *** obtain Ultrasound of the liver to rule out hepatocellular carcinoma and EGD to rule out esophageal varices ***" (Ex. E at 3). The requirement of an EGD for a cirrhotic patient being considered for Hepatitis C treatment was not Wexford's. Esophageal varices pose a serious risk of harm to a cirrhotic patient because they can rupture, causing catastrophic upper GI bleeding. The risk posed to a cirrhotic patient from esophageal varices is greater than the risk posed by Hepatitis C. The EGD is necessary in the workup of cirrhotic patients with Hepatitis C because once the presence of varices is known, they can be treated to decrease the risk from variceal bleeding.

On March 18, 2015, Dr. Paul emailed with Dr. Chan from UIC requesting that despite Plaintiff's insufficient length of stay, he be considered for treatment under the IDOC Hepatitis C Guideline. Dr. Chan is part of the UIC infectious disease team that IDOC uses to evaluate and treat patients for Hepatitis C. That day, after reviewing Plaintiff's FibroSure result of Stage 4 Fibrosis (cirrhosis), per the March 2015 IDOC Hepatitis C Guideline and her correspondence with Dr. Chan, Dr. Paul recommended Plaintiff undergo (1) an EGD to rule out varices and (2) a liver and spleen ultrasound to assess for splenomegaly.

As of April 10, 2015, nothing medically precluded Plaintiff from being referred to UIC for consideration for treatment. The length of stay Plaintiff had left was still a consideration under the Guidelines. (Ex. A at 39).

On April 28 and May 12, 2015, Plaintiff refused the EGD procedure. Plaintiff testified this was because he misunderstood and thought the test was an EKG, which he

did not think he needed because he did not have heart problems, and that no one explained why he was being taken to the doctor. (Ex. H at 80-91). On May 18, Dr. Paul noted that Plaintiff had refused the EGD which rendered him no longer a candidate for Hepatitis C treatment. (Ex. A at 33-34). Plaintiff testified that he would not have refused the EGD if he knew he needed it to receive Hepatitis C treatment, and he later agreed to an EGD, date unclear, related to being placed on a liver transplant recipient list.

Plaintiff was released from IDOC in November 2015. He ultimately did not receive Hepatitis C treatment, due to delays in completion of his initial workup and lab tests. (Ex. C at 103). Dr. Paul testified that her job included ordering the lab work for Hepatitis C patients, and that under the 2014 Guidelines not having all the necessary documents could delay an evaluation but did not preclude treatment.

Plaintiff's expert opines that there was a failure to adhere to the Hepatitis C Guidelines and failure to monitor and treat Plaintiff's Hepatitis C, and that this more likely than not increased Plaintiff's risk of cirrhosis and cancer, which caused or contributed to his later cirrhosis and cancer.

## ANALYSIS

"The Eighth Amendment proscribes deliberate indifference to serious medical needs of prisoners amounting to the unnecessary and wanton infliction of pain." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 678–79 (7th Cir. 2023) (internal quotation marks omitted).

Plaintiff pursues a deliberate indifference claim against Wexford pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "*Monell* governs Wexford's

liability in this case because we, like our sister circuits, treat private corporations acting under color of state law as municipalities." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021), citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014).

To prevail on this claim, a plaintiff must show (1) that he was deprived of a federal right, (2) that the deprivation must be traceable to some corporate action or inaction, (3) that the corporation exhibited deliberate indifference to the risk of harm caused by its action or inaction, and (4) that the corporate action or inaction was the moving force, i.e., bore a direct causal link, to the violation of the plaintiff's constitutional rights. *Dean*, 18 F.4th at 236.

Plaintiff may show Wexford's action or inaction by "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) a … constitutional injury … caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Inaction can give rise to liability only if it reflects "a conscious decision not to take action." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

As to deliberate indifference, "This is a high bar. If a municipality's action is not facially unconstitutional, the plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Dean*, 18 F.4th at 235 (cleaned up).

Deliberate indifference is more than simple ignorance; it requires a culpable state of mind, akin to criminal recklessness. *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006).

Here, the Court finds as follows.

**Plaintiff suffered from a "serious medical need."** Plaintiff's Hepatitis C diagnosis was a serious medical need.

**Wexford did not culpably delay or deny Plaintiff medical treatment.** Wexford does not maintain any express policy of its own regarding Hepatitis C treatment of IDOC inmates. Instead, IDOC and UIC have an interagency agreement for the treatment of Hepatitis C in Illinois prisons. That agreement has resulted in the promulgation of the various iterations of the IDOC Hepatitis C Guidelines. Wexford and its doctors follow the IDOC Hepatitis C Guidelines as they evolve.

Plaintiff asserts that Wexford maintains widespread practices or customs that evince deliberate indifference to Plaintiff's serious medical need for Hepatitis C treatment.

To prove *Monell* liability indirectly "'a plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Dixon v. County of Cook,* 819 F.3d 343, 348 (7th Cir. 2016), (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)); *but see Estate of Novack v. County of Wood,* 226 F.3d 525, 531 (7th Cir. 2000) (explaining that showing policy itself is unconstitutional is "direct" method). This requires more than showing one or two missteps. *Id.*

Also, to prove an official policy, custom, or practice within the meaning of *Monell*, a plaintiff must show more than the deficiencies specific to his own experience. *See Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2006) (liability requires conduct in "more than one instance"), quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988).

Here, Plaintiff establishes that Dr. Kayira, Dr. Goodman, and Dr. Paul had overlapping but slightly different interpretations of IDOC's guidelines. But these differences of interpretation of the applicable IDOC Hepatitis C Guideline are insufficient to establish that Wexford as an organization was aware of and had a policy to ignore what was happening. Instead, Plaintiff complains that the individual doctors who treated him did not do enough to ensure he received speedy Hepatitis C treatment, despite Plaintiff (1) twice declining an important diagnostic test (the EGD), (2) having suffered from a known Hepatitis C infection for 15 years without treatment prior to incarceration in IDOC, and (3) Wexford doctors repeatedly seeking exceptions to IDOC's 12-months-left-in-custody rule on Plaintiff's behalf.

Even if Plaintiff had established sufficient evidence to show Wexford had a corporate custom, policy, or widespread practice of delaying Hepatitis C treatment, Plaintiff has failed to put forth any evidence from which a reasonable jury could find Wexford was deliberately indifferent in maintaining such a policy.

Plaintiff must prove that it was obvious that Wexford's course of action or inaction would lead to constitutional violations and that it consciously disregarded the consequences. *Dean*, 18 F.4th at 235. A Plaintiff relying on a widespread custom or

practice "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *LaPorta v. City of Chicago*, 988 F.3d 978, 986-987 (7th Cir. 2021). Negligence or even gross negligence on the part of the municipality is not enough. *Id.* The most Plaintiff points to as evidence of deliberate indifference is Plaintiff's medical records, but those records only show a course of treatment. They do not indicate Wexford's intent behind that course of treatment at all.

**Plaintiff's refusal of the EGD also forecloses relief in this case.** If more were needed to show that Defendant is entitled to judgment as a matter of law, Plaintiff's refusal of the EGD test on two occasions supplies it. On April 28, 2015, Plaintiff refused an EGD (a required esophagus exam to determine if a patient should receive Hepatitis C treatment under the Guidelines) because he thought it was a heart test, an EKG. (Ex. H at 83-84). After refusing the test, the specialist went on to explain that the test was unrelated to his heart, and rather was a test of Plaintiff's upper GI tract and a precursor to his Hepatitis C care. *Id.* On May 2, Plaintiff's treating physician at Vienna appears to have extensively consulted with Plaintiff and explained the procedure and why it was necessary, though Plaintiff does not recall the conversation; Plaintiff then again refused the EGD procedure. The Court notes that Plaintiff also repeatedly refused to agree to the release of his medical records to doctors within the prisons. (Ex. H at 80-91).

The Seventh Circuit has recognized that refusal of treatment by a competent person defeats their Eighth Amendment claim. *Walker v. Peters,* 233 F.3d 494, 498 (7th Cir. 2000). Here, though Plaintiff does not now recall it, the medical records clearly

show that Plaintiff was sent by Wexford doctors for an EGD test on two occasions and refused both. This too entitles Defendant to summary judgment.

**Plaintiff's primary cited authority is unpersuasive.** Plaintiff relies heavily – almost exclusively – on *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 928 (7th Cir. 2004) to support his *Monell* claim. In that case, an inmate of the Lake County Jail committed suicide, and his estate prevailed after a jury trial in proving that the mental health and suicide prevention policies of the jail's healthcare contractor supported *Monell* liability.

But in *Woodward*, the plaintiff presented ample evidence that the corporate defendant failed to train its employees, including condoning the practice of employees not completing inmate mental health forms. An individual defendant there agreed that he did not review inmate intake forms, and the evidence showed the corporate defendant's management knew about and permitted that practice. The evidence also showed that the corporate defendant's chief of health administration knew one of the individual defendants challenged inmate suicide watch referrals and resisted putting inmates on suicide watch. And the corporate defendant's chief of health administration and its regional directors knew that its employees disregarded written policies, but did nothing about it.

Plaintiff has put forth no evidence of the same kind here. There is no indication that Wexford's employees failed to follow IDOC's Hepatitis C treatment guidelines, that they had a practice of failing to do so, or that they maintained such a practice in knowing disregard of inmates' medical needs for Hepatitis C treatment – much less that

Wexford's policymakers knew any of these issues and continued without addressing them.

**IT IS THEREFORE ORDERED:**

1) Defendant's unopposed Motion for Extension of Time [59] is GRANTED.

2) Defendant's Motion for Summary Judgment [52] is GRANTED. This action is terminated. Judgment to enter for Defendant.

Entered this 2nd day of October, 2023.

*s/James E. Shadid*
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE
